FILED
2026 Jun-02  PM 04:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:24-CR-435-ACA-NAD** |
| | ) | |
| **DAQWON DEANGELO THOMAS** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD VARIANCE**

The defendant, DaQwon Deangelo Thomas, will come before the court for sentencing on June 9, 2026,  on one count of conspiring to make false statements to a federal firearms licensee (FFL) in violation of 18 U.S.C. § 922(a)(6) and 18 U.S.C. § 371.  This was not a typical straw purchase by a felon.  Mr. Thomas has no criminal history.  Mr. Thomas used another individual to purchase two firearms for him from a licensed FFL when he was under 21 because FFLs, unlike individuals, are not permitted to sell firearms to adults under 21.  The presentence investigation report (PSR) calculates an advisory Guidelines range of 30-37 months.  Defendant objected and argued that this Guidelines range is improperly calculated because it includes an unrelated gun from an unrelated traffic stop months after the straw purchase conspiracy as relevant conduct.  This objection remains outstanding.   Without the impermissible relevant conduct, the advisory Guidelines range is 6-12 months in Zone B, which allows for a split sentence of home confinement. Mr. Thomas respectfully asks that the Court sustain his objections and then impose a probationary sentence of three years as a downward variance from his correctly calculated advisory Guidelines range of 6 to 12 months.  In the alternative, Mr. Thomas asks the court to impose a Guidelines sentence of 12 months probation with a condition that 6 months be served as home confinement.

1

Mr. Thomas made a poor choice in choosing to straw purchase a gun from an FFL at the age of 19 before he was able to do so legally at 21.  He has accepted responsibility for his offense, is gainfully employed by FedEx, and will be a father to twins come September. He asks this court to give him the opportunity to continue to be a productive employee and financial provider for his family.

## I. BACKGROUND

### A.  Indictment, Guilty Plea, and Undisputed Facts

On October 30, 2024, the grand jury returned a one-count indictment charging Mr. Thomas with conspiring to give false statements to an FFL in violation of 18 U.S.C. § 922(a)(6) and 18 U.S.C. § 371.  Doc. 1.  The indictment alleged that Mr. Thomas and an unnamed co-conspirator participated in this conspiracy from on or about December 28, 2022 to April 28, 2023.  Id. at 2, ¶ 2.  According to the indictment, on each of those dates, Mr. Thomas caused the co-conspirator to enter an FFL, purchase a firearm on Mr. Thomas's behalf, and then falsely certify on a Form 4473 that the co-conspirator was the true purchaser of the firearm.  Id. at 3–5, ¶ 4.  At the time, Mr. Thomas was 19 years old and therefore could not lawfully purchase a weapon from an FFL.  Id. at 1, ¶ 1.  On December 28, 2022, the co-conspirator allegedly purchased and then delivered to Mr. Thomas a Glock .40 caliber pistol; on April 28, 2023, the co-conspirator allegedly purchased and delivered to Mr. Thomas a Delton 5.56 caliber pistol.  Id. at 4–5, ¶ 4.

Thereafter, on November 12, 2024, Mr. Thomas appeared before a magistrate judge and pleaded not guilty and was released on bond.  Doc. 4.  On January 28, 2026, Mr. Thomas appeared before the Court and changed his plea to guilty.  There was no plea agreement, and as such Mr. Thomas only admitted the facts necessary to support the offense, but no other facts alleged by the government.

The only undisputed facts in this matter are those relating to the charged offense – the straw purchase of two guns between December 2022 and April 2023. The Defendant has admitted he conspired with Co-Conspirator A, to purchase a Glock 22, .40 caliber pistol and a Delton Incorporated Lima, 5.56 caliber pistol for him from an FFL because he was under the age of 21. Defendant has admitted that Co-Conspirator A lied on the relevant ATF Forms to do so. Neither of these guns had switches and neither was stolen.

B.      Presentence Investigation Report and Objections

On March 24, 2026, the Probation Office (Probation) provided the parties with a draft presentence investigation report (PSR) that calculated the advisory Guidelines range as 30-37 months. This calculation was significantly higher than the defense anticipated based on its own draft calculations and its plea discussions with the government. The calculation was higher than expected because it was largely based on the uncharged gun that Mr. Thomas was found with in a traffic stop six months after the offense of conviction – a gun he did not straw purchase with Co-conspirator A or anyone else. On April 7, 2026, the defense objected and argued that the appropriate calculation was 6-12 months. A comparison of the calculations is below:

| Guideline | PSR | Defense |
| --- | --- | --- |
| **Base Offense 2K2.1(a)** | **+18** – Based on alleged possession of gun with a Glock switch as relevant conduct | **+12** – Because Defendant had no felony history and neither gun involved in charged offense qualified for an enhancement |
| **# of Guns 2K2.1(b)(1)** | **+2** - More than 3 based on two straw purchased and one uncharged gun in car | **+0** – Only two guns involved in charged straw purchase |
| **Stolen Gun 2K2.1(b)(4)** | **+2** – Based on uncharged gun in traffic stop being stolen | **+0** – Neither gun involved in charged straw purchase was stolen |
| **Acceptance 3E1.1** | **-3** – Offense level over 16 | **-2** – Offense level under 16 |
| **TOL and Range at CH 1** | **19, 30-37 Mo. Zone D** | **10, 6-12 Mo. Zone B** |

3

On April 21, 2026, Probation provided an addendum to the presentence report. In that Addendum, Probation contends that the offense conduct in paragraphs 11 through 19 are relevant conduct because "[w]ithout [the events that were described in paragraphs 11 through 16], the facts to which the defendant pled would not have been discovered." PSR add. at 2. Probation also states that possession of firearms was "part of the same course of conduct or common scheme or plan because the acts involve: common victims—the societal interest harmed; common purpose—the illegal possession of firearms; and similar *modus operandi*." Id. Probation agrees with Mr. Thomas that if the Court sustained his relevant conduct objection, the total offense level would be 10. Id. at 3.

## II. ARGUMENT

Probation's relevant-conduct analysis is flawed. The defense has not located any other gun case that addresses relevant conduct in a similar way. The incorrect inclusion of the uncharged gun allegedly located in the traffic stop as relevant conduct added two years to the recommended sentence, more than tripling it. Under the plain language of section 1B1.3, Mr. Thomas's possession of a firearm on October 26, 2023 that he personally obtained from an individual through a Facebook sale is simply not relevant conduct for a conspiracy to straw purchase two others guns from an FFL six months earlier.[1] Just because the traffic stop led to Mr. Thomas's admission that

---

[1] It is notable that many Circuits require that only *criminal* conduct be used as relevant conduct to increase a defendant's offense level. See, e.g. United States v. Griffith, 584 F.3d 1004, 1013 (10th Cir. 2009) ("[W]e hold that for a district court to consider a defendant's conduct as 'relevant' under the Sentencing Guidelines, the Government must prove by a preponderance of the evidence that the defendant (1) engaged in conduct (2) related to the offense of conviction pursuant to U.S.S.G. § 1B1.3 and (3) constituting a criminal offense under either a federal or a state statute."); United States v. Schaefer, 291 F.3d 932, 939–40 (7th Cir. 2002) ("In short, § 1B1.3(a) explicates the fundamental rule that relevant conduct must be criminal in nature[.]"); United States v. Dove, 247 F.3d 152, 155 (4th Cir. 2001) ("We thus conduced that relevant conduct under the Guidelines must be criminal conduct."); United States v. Peterson, 101 F.3d 375, 385 (5th Cir. 1996) ("For conduct to be considered 'relevant conduct' for the purpose of establishing one['s] offense level that conduct must be criminal" because to hold otherwise would "allow individuals to be punished by having their guideline range increased for activity which is not prohibited by law but merely morally distasteful or viewed as simply wrong by the sentencing court."). In a 2006 opinion, the Eleventh Circuit acknowledged the prevailing view of the other circuits regarding the need for criminal conduct, but stated that the "issue [was] not before [the Court] under the facts of [the] case." United States v. Norris, 452 F.3d 1275, 1281 n.1

4

he straw purchased guns six months before and thus his indictment, that does not mean that the traffic stop is part of his charged conduct or sufficiently connected to it to be relevant conduct. Without the incorrect relevant conduct analysis, the Guidelines would be 6-12 months in Zone B. Given the correct Guidelines range and Mr. Thomas's personal characteristics and the nature and circumstances of the offense, a sentence of 3 years' probation, or in the alternative 1 year of probation with 6 months of home confinement is sufficient but not greater than necessary to accomplish the purposes of sentencing.

### A.    The Relevant Conduct Standard

Section 1B1.3 of the Guidelines provides sentencing courts with rules for determining whether extrinsic, uncharged conduct should be deemed relevant to the conduct underlying a defendant's offense of conviction and thus factored in when determining the defendant's offense level.   See U.S.S.G. § 1B1.3(a).   Section 1B1.3 is designed to take account of a pattern of misconduct that cannot readily be separated and charged. See  United States v. Blanc, 146 F.3d 847, 852 (11th Cir. 1998). It is not designed for purposes of sentencing a defendant on unrelated offenses that the Government cannot sufficiently prove.

Subsection (a)(1) defines "relevant conduct" by who committed it and when it occurred in relation to the charged offense.  Relevant conduct in includes  "**all acts and omissions, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant**" or

---

(11th Cir. 2006).   Here, the facts, as included in the PSR and discovery, suggest that Mr. Thomas' possession of the gun on October 26, 2023 was not criminal because he was not a felon and he was not aware that the gun was either stolen or contained a Glock switch. United States v. Seabrooks, 839 F.3d 1326, 1333 (11th Cir. 2016) ("To support a § 922(j) conviction, the government must prove that . . . (3) the defendant knew or had reason to know that the firearms were stolen.");   11th Cir. Pattern Jury Ins. O34.8 (providing that a defendant may be found guilty of possession of a machine gun only if it is proven beyond a reasonable doubt, inter alia, "the Defendant knew it was a machine gun or was aware of the firearm's essential characteristics that made it a 'machine gun' was defined"). See PSR at 9, ¶¶ 18-19.

in certain limited circumstances his co-conspirators, [2] that **occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense**." U.S.S.G. § 1B1.3(a)(1).

Alternatively, subsection (a)(2) allows for inclusion of conduct separate from the offense of conviction, in limited circumstances, because it is "part of the same course of conduct or common scheme or plan as the offense of conviction." This subsection reads: "solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction." Id. § 1B1.3(a)(2). See also subsection 3D1.2(d) (defining when offenses are to be grouped).

Section 2K2.1, the provision used to determine Mr. Thomas's base offense level for conspiracy to straw purchase firearms, would arguably be grouped with any crime Mr. Thomas could arguably have been charged with for possessing the Glock 27 in J.K.'s vehicle, so subsection (a)(2) is potentially applicable. See United States v. Howard, No. 1:19-CR-54-WKW, 2020 WL 1015752, *2 (M.D. Ala. Mar. 2,2020) (explaining that the "first requirement" for § 1B1.3(a)(2) "was met" because the extrinsic firearms possession "could have been charged as a § 922(g) offense . . . which would have required grouping with Defendant's . . . § 922(k) offense"). The Court must, therefore, assess whether either subsection (a)(1)(A) or (a)(2) provides a path for treating the October 26, 2023 firearm possession as relevant conduct. Probation erred in deeming the events of October 26, 2023 relevant conduct under either subsection.

---

[2] Subsection (a)(1)(B) contains a provision that permits third-party actions to be treated as relevant conduct when such actions were undertaken "in the case of a jointly undertaken criminal activity" and meet the other criteria described above. See U.S.S.G. § 1B1.3(a)(1)(B)(i)–(iii). This provision is inapposite, as it was Mr. Thomas's own conduct on October 26, 2023 that Probation erroneously deemed relevant.

**B. Subsection (a)(1)(A) is Inapplicable Because Possession of an Illegal Gun During the Traffic Stop Was Not Willfully Caused by the Defendant in Connection with the Charged Offense**

As discussed above in footnote 1, evidence does not suggest that Mr. Thomas willfully possessed an illegal gun during the traffic stop. However, even if Mr. Thomas had willfully committed a crime by possessing the Glock 27, such a crime would be too distinct from the false-statements conspiracy to be considered in calculating Mr. Thomas's offense level. Looking first at subsection (a)(1)(A), Mr. Thomas did not possess the offense "during the commission of the [false-statements conspiracy], in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." See U.S.S.G. § 1B1.3(a)(1)(A).

The indictment makes clear that the conspiracy giving rise to the conviction concluded in April of 2023—approximately six months before Mr. Thomas possessed the Glock 27. See Doc. 1 at 2, ¶ 2. Therefore, Mr. Thomas did not possess the Glock 27 during the commission of the conspiracy offense, nor did he do so while preparing to commit the offense. See U.S.S.G. § 1B1.3(a)(1)(A).

As for whether he did so while attempting to avoid detection or responsibility for the offense, no fact in the PSR supports such a conclusion. In fact, the PSR reveals just the opposite—that Mr. Thomas made no attempt to avoid detection or responsibility for the false-statements conspiracy. Rather, Mr. Thomas participated in a voluntary interview with federal law enforcement agents during which he revealed to the agents that he had solicited the help of another person to obtain two firearms, neither of which were still in his possession or known to the agents at the time. It is safe to say that absent Mr. Thomas's statements the agents would not have uncovered the conspiracy at issue. Although the PSR suggests that Mr. Thomas traded one of the weapons obtained through the false-statements conspiracy, the Delton 5.56, to obtain the Glock 27, there is

7

nothing in the PSR to suggest that he did so for the purpose of concealing how he obtained the Delton 5.56—i.e., as a fruit of the false-statements conspiracy. Again, had Mr. Thomas been trying to reveal the existence of the Delton 5.56, he would not have volunteered to the agents his previous possession of it.

**C. Subsection (a)(2) is Inapplicable Because Possession of the Gun During the Traffic Stop was not Part of the Same Course of Conduct or Common Scheme or Plan as the Straw Purchase Conspiracy.**

Turning to subsection (a)(2), the events of October 26, 2023 were not "part of the same course of conduct or common scheme or plan as" the false-statements conspiracy. See U.S.S.G. § 1B1.3(a)(2). The following first elaborates on the meanings of "common scheme or plan" and "same course of conduct" and then explains why neither definition is satisfied here.

**1. Definitional Guidance**

Application note 5 to § 1B1.3 defines the terms "common scheme or plan" and "same course of conduct." See U.S.S.G. § 1B1.3, app. n. 5(B)(i)–(ii). Specifically, the note provides that "two or more offenses constitute part of a common scheme or plan" when they are "substantially connected to one another by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." Id., app. n. 5(B)(i). As for the "same course of conduct" prong, the application note states that "[o]ffenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant a conclusion that they are part of a single episode, spree, or ongoing series of offenses." Id., app. n. 5(B)(ii). Factors relevant to determining whether the "same course of conduct" provision applies include: "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between

the offenses." Id. When one of these factors "is absent, a stronger presence of at least one of the other factors is required." Id.

There is some ambiguity within the Circuit as to the continued viability of this application note post-United States v. Dupree. See 57 F.4th 1269 (11th Cir. 2023) (en banc) (holding that a sentencing court should only look to the Sentencing Guidelines' application notes and commentary when a Guidelines provision is "'genuinely ambiguous"). However, regardless of whether they are relying on the application note or plain meanings, courts in the Eleventh Circuit have looked at similar facts to those articulated in the application notes – similarity, temporal proximity, regularity or repetition, and connectedness in determining whether two events are part of a common scheme or plan or same course of conduct. See United States v. Brooks, 112 F.4th 937, 946–947 (11th Cir. 2024) (holding possession of one gun was part of same course of conduct as possession of another when both involved the same offense—possession as a felon and they were three months apart);[3] see also United States v. Gyetvay, 149 F.4th 1213, 1240–41 (11th Cir. 2025) (finding failure to report foreign bank accounts between 2005-2013 relevant to failure to report in 2014 because they all sought to defraud a common victim—the IRS, for a common purpose—concealing taxable money in Swiss accounts); United States v. Young, No. 25-11552, 2026 WL 866895, *2 (11th Cir. Mar. 30, 2026) (finding multiple instances of possessing firearm as a felon with temporal proximity relevant).

---

[3] U.S. v. Brooks is the published Eleventh Circuit case that most clearly addresses relevant conduct and the possession of firearms on separate occasions. However, Brooks and all of the cases it cites are distinguishable from the instant case because they address possessions on separate occasions by felons in possession. This is not a felon in possession case. To be equivalent to Brooks, the facts here would have needed to involve other guns that Thomas straw purchased with the same co-conspirator or at the same FFL.

9

2.      **The Absence of a Common Scheme or Plan**

Beginning with the "common scheme or plan" prong, there is no common factor linking the false-statements conspiracy and Mr. Thomas's possession of a firearm months later. As for common offenders, according to the PSR, the false-statements conspiracy involved Mr. Thomas and Co-Conspirator A; on October 26, 2023, Mr. Thomas was in the vehicle with a different person, J.K. PSR at 8–9, ¶¶ 12, 19–21. Turning to purpose, Mr. Thomas's purpose in participating in the false-statements conspiracy was to obtain new firearms from a licensed FFL—the Glock .40 and the Delton 5.56. It is unclear from the PSR why Mr. Thomas was in J.K.'s vehicle on October 26, 2023. However, nothing suggests that he was trying to obtain new weapons from an FFL that evening. Moreover, no common modus operandi can be found. The conspiracy involved having a co-conspirator go to a firearms dealer and obtain weapons for Mr. Thomas. Nothing of the sort occurred on October 26, 2023. Rather, that evening, Mr. Thomas allegedly personally possessed a wholly different firearm that he had traded for based on an internet posting. See United States v. Whitsett, 802 F. App'x 526, 532–33 (11th Cir. 2020) (after the defendant pleaded guilty to, in August of 2017, possessing methamphetamine with the intent to distribute it, the district court erred by treating as relevant conduct the defendant's July 2018 methamphetamine possession because the two events did not involve common victims, the same accomplices, common purposes (aside from a generalized intent to distribute), or common modus operandi ("beyond the mere possession of drugs and drug paraphernalia suggesting an intent to distribute")).[4]

The only common link between the conspiracy and the events on the night of the traffic stop is the very generalized presence of a firearm. However, given the ubiquity of guns in society,

---

[4] Probation asserts, without elaboration or explanation, that the two incidents involved "similar modus operandi." PSR add. at 2. It is unclear why Probation thinks this to be the case, particularly given the vast differences discussed above between the two incidents, particularly the differences in the way Defendant obtained the guns.

10

if the presence of a firearm alone were enough to make disparate events relevant to one another, then there would be virtually no limitation on what constitutes relevant conduct. Cf. Whitsett, 802 F. App'x at 533 ("We [have] warned . . . against finding that otherwise discrete offenses constituted parts of a common scheme or plan based solely on the fact that both involved activity fundamental to drug distribution."). This cannot be so.[5]

### 3.      The Absence of a Single Course of Conduct

Likewise, the "similarity, regularity, and temporal proximity" factors make it clear that by engaging in the false-statements conspiracy and then possessing the firearm while in the vehicle with J.K., Mr. Thomas did not participate in a single course of conduct. See United States v. Maxwell, 34 F.3d 1006, 1011 (11th Cir. 1994); see also United States v. Amedeo, 370 F.3d 1305, 1314 (11th Cir. 2004) ("In assessing whether conduct is relevant for purposes of § 1B1.3, we look to the 'similarity, regularity, and temporal proximity' between the offense of conviction and the uncharged conduct.").

#### i.      The Lack of Similarity

Beginning with similarity, on this prong, the Court must consider "whether there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind." Maxwell, 34 F.3d at 1011 (quotation marks omitted). Applying these principles, in United States v. Maxwell, the Eleventh Circuit held that a district court erred when it treated the defendant's scheme to distribute cocaine as relevant conduct in his sentencing for

---

[5] Probation contends that the two incidents are part of a common scheme or plan because "the case was initiated by the events that occurred [on October 26, 2023]" and "[w]ithout those events, the facts to which the defendant pled [guilty] would not have been discovered." PSR add. at 2. Probation's position is confusing. First, nothing in the Guidelines, the application notes, or existing precedent suggests that an unrelated extrinsic event may be considered relevant conduct because of an investigatory link. Probation seems to have manufactured out of whole cloth a new avenue for extrinsic conduct to be considered relevant.

conspiring to distribute hydromorphone (referred to in the opinion by a brand name, "Dilaudid"). Id. at 1011–12. The Court stressed that the two drug distribution schemes involved different parties and the defendant's participation in the two schemes occurred more than a year apart. Id. at 1011. In light of the clear distinctions between the two schemes, treating the uncharged cocaine conspiracy as relevant conduct would require applying "such a level of generality as to eviscerate the evaluation of whether uncharged criminal activity is part of 'the same course of conduct or common scheme or plan' as the offense of conviction." Id. (quotation marks omitted). Quoting a Fourth Circuit opinion, United States v. Mullins, the Court went on, "'With a brushstroke that broad, almost any uncharged criminal activity can be painted as similar in at least one respect to the charged criminal conduct.'" Id. (quoting United States v. Mullins, 971 F.2d 1138, 1145 (4th Cir. 1992).

Maxwell is instructive. As was the case there, the false-statements conspiracy and the October 26, 2023 firearm possession involved different persons and occurred at different times (as discussed below). See id. The presence of firearms is the only commonality between the two. However, this very generalized common feature is insufficient to render different actions part of a single course of conduct. See id.

The differences between the two courses of conduct are stark. The false-statements conspiracy involved a continuing course of conduct occurring over a five-month period; the firearm possession was an isolated event occurring on one evening. The false-statements conspiracy involved jointly undertaken criminal activity; the firearm possession involved Mr. Thomas acting alone. The false-statements conspiracy was, in essence, a fraud offense; to the extent the firearm possession was an offense at all, it would be a regulatory crime. Indeed, the false-statements conspiracy to which Mr. Thomas pleaded guilty would be far more similar to a

12

conspiracy to commit bank fraud, see 18 U.S.C. §§ 1349, 1344, or a conspiracy to make false statements to federal agent, see 18 U.S.C. §§ 371, 1001, than to a firearm-possession crime.

In short, just as the Maxwell Court did not "think that two offenses constitute a single course of conduct simply because they both involve drug distribution," so too, here, the presence of a firearm cannot transform two courses of conduct into one. See 34 F.3d at 1011. To hold otherwise would require applying a level of "generality as to eviscerate" the similarity requirement. See id.; see also United States v. Buchanon, 299 F. App'x 903, 904 (11th Cir. 2008) ("'Distinctive similarities' are more than general abstractions of conduct."). Thus, the similarity prong does not suggest that Mr. Thomas engaged in a single course of conduct.

### ii.    The Lack of Regularity

Turning to regularity, the Eleventh Circuit has indicated that this prong is not satisfied where the extrinsic conduct occurred only once. See Brooks, 112 F.4th at 946 ("As to the second factor, there admittedly was not a high 'regularity' of this offense because the incident involving the stolen Smith & Wesson was the only additional incident that the government cited in which Brooks possessed a firearm."). Other courts have held similarly. See United States v. Hill, 79 F.3d 1477, 1484 (6th Cir. 1996) ("Regularity is completely absent here, for the government proved only one prior offense."); United States v. Hahn, 960 F.2d 903, 911 (9th Cir. 1992) ("Regularity is wanting in the case of a solitary, temporally remote event, and therefore such an event cannot constitute relevant conduct without a strong showing of substantial similarity."); United States v. Mack, 524 F. App'x 756, 757 (2d Cir. 2013) ("And it is hard to detect 'regularity' in the two isolated incidents."); United States v. Lawrence, 214 F. Supp. 3d 401, 412 (E.D. Pa. 2016) ("The sole factor that does not weigh in favor of finding a common course of conduct is regularity, as the .40 caliber Beretta was only found to have been used in a single felony other than the offense of conviction.").

Here, the PSR reports only one instance of Mr. Thomas possessing the Glock 27.  This single, isolated occurrence cannot establish regularity.  Accordingly, this prong also counsels against the existence of a single course of conduct.

### iii.    Temporal Proximity Analysis

Finally, on the temporal proximity prong, approximately six months separated the end of the false-statements conspiracy and the traffic stop.  The Eleventh Circuit has not stated clearly how long the gap has to be before it will find temporal proximity lacking.  In Brooks, the Court held that the government established the temporal-proximity prong where only three months separated the extrinsic conduct from the charged offense.  112 F.4th at 946–47.  The Court cited with approval cases from other circuits in which courts found temporal proximity despite multi-month gaps between occurrences.  Id. at 947 (citing United States v. Santoro, 159 F.3d 318, 321 (7th Cir. 1998) (upholding the finding of a common scheme or plan where the extrinsic conduct occurred "within six to nine months of" the defendant's arrest for the charged offenses); United States v. Brummett, 355 F.3d 343, 345 (5th Cir. 2003) (upholding the finding of temporal proximity where the defendant "possessed four firearms on three separate occasions within a nine month period"); United States v. Windle, 74 F.3d 997, 1000 (10th Cir. 1996) (the defendant possessed multiple illegal firearms over a five-month period)).  In United States v. Buchanon, an unpublished opinion, the Court affirmed the district court's conclusion that a five-month gap was not too long for a finding of temporal proximity stating, "we have never held that a five-month separation between two offenses is too remote in time."  299 F. App'x at 905.  Thus, the Circuit's dicta and unpublished cases might suggest that temporal proximity is met here.  However, this is far from clear.

14

On the other hand, in <u>Mullins</u>, the Fourth Circuit opinion quoted favorably by the Eleventh Circuit in <u>Maxwell</u>, that court concluded that temporal proximity was "extremely weak . . . , if present at all, as the uncharged conduct took place over six months prior to" the conduct underlying the offense of conviction." 971 F.2d at 1144.  Similarly, the Ninth Circuit held that even a five-month gap was "temporally remote." <u>Hahn</u>, 960 F.2d at 910–11.  The Seventh Circuit deemed a gap only slightly longer than the one at issue here too long to satisfy the temporal proximity prong. <u>See</u> <u>United States v. Ortiz</u>, 431 F.3d 1035, 1041 (7th Cir. 2005) (10-month gap).

All of this is to say, there is no bright line rule within the Eleventh Circuit for how long is too long.  While the line might be beyond the six-month mark, the cases discussed above suggest that it is not too far beyond that point.  Accordingly, to the extent that the temporal proximity prong counsels in favor of finding a single course of conduct, it does so only slightly.

### iv.    Balancing the Factors

This weak presence of temporal proximity is insufficient to compensate for the absence of similarity and regularity.  <u>See</u> U.S.S.G. § 1B1.3, app. n. 5.  Viewing the three factors collectively, it is readily apparent that the false-statements conspiracy and the firearm possession were not part of a single course of conduct as Probation's analysis might suggest.  Rather, the October 26, 2023 firearm possession was a "discrete identifiable unit" that should not be factored into Mr. Thomas's for the false-statements conspiracy.  <u>See</u> <u>Blanc</u>, 146 F.3d at 852.

### D.    Conclusion

Even if Mr. Thomas's firearm possession was somehow illegal, such a crime did not satisfy any of § 1B1.3's definitions of "relevant conduct."  The firearm possession and the offense of conviction were not aspects of a common scheme or plan or single course of conduct.  Therefore, the objections should be sustained.

15

### III. RECOMMENDED SENTENCE

Mr. Thomas recommends that the Court calculate an advisory Guidelines range of 6 to 12 months' imprisonment. Because Mr. Thomas's correctly calculated Guidelines range falls within Zone B, Mr. Thomas urges the Court to impose a probationary sentence as a downward variance. Alternatively, Mr. Thomas seeks a within-Guidelines sentence of a term of probation that requires, as a special condition, that he serve 6 months (the minimum term of imprisonment) on home detention.

Such a sentence will be sufficient but not greater than necessary to achieve the statutory sentencing goals. See 18 U.S.C. § 3553(a). As for Mr. Thomas's history and characteristics, see id. § 3553(a)(1), he overcame difficult family circumstances to complete his education, earn a living, and now support his own family. For the past several years, Mr. Thomas has supported a previous partner's daughter, whose father passed away when she was 11 months old. See Ex. C, Letter from Darnesha Snipe. He has also been a father figure to his girlfriend's daughter, and later this year, he will welcome his first biological children to the world, as his girlfriend is expecting twins in September. See Ex. E, Letter from D'Niyah McCary. Moreover, aside from marijuana-possession arrests, Mr. Thomas has no criminal history whatsoever. With part-time employment, ambition to find more full-time work, and two children coming in just a few months, Mr. Thomas is well-positioned to contribute to both his family and society. His aunt—with whom he is living—writes that she has "seen a genuine shift in his mindset since learning" that he will be a father to twins and that he "talks often about wanting to be present, to provide for his children, and to break any cycles that could harm their future." Ex. A, Letter from LaShundra Thomas. His mother writes that "[w]hat defines DaQwon is his heart" and "his love for family." Ex. D, Letter from Andreal Thomas. Further, he has significant family support to use this experience with the Court as a

turning point in his life. His great-grandmother writes that her "family is ready to stand by him, to guide him, and to help him find a better path." Ex. B, Letter from Brenda Mckinney.

Turning to the nature and circumstances of the offense, see id., Mr. Thomas's crime was, in essence, regulatory in nature and Mr. Thomas acted in furtherance of the conspiracy only twice during the conspiracy's existence.  Moreover, Mr. Thomas committed the offense when he was only 19-years-old.  It is worth noting that, unlike many individuals who participate in "straw purchasing" conspiracies like the one at issue here, Mr. Thomas was not a prohibited person—he was simply too young to buy a gun from an FFL.  This point does not discount the fact that he should not have come to possess the two guns.  But, it is significant that, by acquiring those weapons, he did not commit stand-alone federal crimes (for example, he was not then a convicted felon who could not purchase a gun due to his felony conviction and who, when he obtained the guns, violated the prohibition found at 18 U.S.C. § 922(g)(1)).  Suffice it to say, the conspiracy at issue here consisted of just two bad decisions by someone who was very young with neither decision resulting in harm to another person.  Mr. Thomas deeply regrets his crime.  Nevertheless, he contends that the nature and circumstances suggest that his offenses were less egregious than other conspiracies to make false statements to an FFL.

As for the sentencing goals found at § 3553(a)(2), it is fair to say that a felony conviction and a sentence of home confinement reflects the seriousness of this offense and will deter others from seeking to purchase firearms when they are unable to do so.  Id. § 3553(a)(2)(A)–(B). Moreover, given that Mr. Thomas has never been arrested for an offense involving a victim and is committed to not reoffending, it appears that there is no need to protect the public from future criminal acts.  See id. § 3553(a)(2)(C).

17

As for the need to avoid unwarranted sentence disparities, see id. § 3553(a)(6), the Judiciary Sentencing Information (JSIN) data contained in the PSR is irrelevant, as the data does not correspond to an accurate Guidelines range. See PSR at 19, ¶ 83. Considering the correct Guidelines range, the database reports that, during the last five years, "there were 297 defendants whose primary guideline was § 2K2.1, with a Final Offense Level of 10 and a Criminal History Category of I, after excluding defendants who received a § 5K1.1 substantial assistance departure." See Judiciary Sent'g Information, United States Sent'g Comm., https://jsin.ussc.gov/analytics/saw.dll?Dashboard. Of those 297 defendants, only 133 (45 percent) received custodial sentences, with the average and median sentence lengths being 6 months. Id. This data suggests that the requested non-custodial sentence would be squarely in line with the typical sentence imposed on like offenders.[6]

### IV. CONCLUSION

Based on the foregoing, Mr. Thomas asks that the Court: (1) sustain his Guidelines objections; (2) calculate a new Guidelines range of 6 to 12 months' imprisonment, within Zone B; and (3) impose a probationary sentence as a downward variance or impose a within-Guidelines-range sentence of a term of probation with a requirement that he serve 6 months on home detention. A non-custodial sentence will permit Mr. Thomas to maintain employment and to thus continue to provide for his growing family.

Respectfully submitted this the 2nd day of June, 2026.

/s/ Erica Williamson Barnes
Erica Williamson Barnes
Madison Peace Nye
Counsel for Defendant

---

[6] It is also worth noting that likely most of the 297 individuals recounted in the database committed offenses in which they possessed firearms despite being prohibited by federal law from doing so. In contrast, as noted, Mr. Thomas was not prohibited by any federal criminal statute. Accordingly, his offense is likely less serious than most of the offenses reflected in the database.

**Of Counsel:**

**MAYNARD NEXSEN PC**
1901 Sixth Avenue North
Suite 1700
Birmingham, Alabama 35203-2618
Phone: (205) 254-1115
Fax: (205) 714-6405
Email: ebarnes@maynardnexsen.com
        mnye@maynardnexsen.com